**Frank DENNIS, Plaintiff,**

**v.**

**T. O. BRADBURY and N. B. Burt, Defendants.**

**Civ. A. No. 6480.**

United States District Court
D. Colorado.

Dec. 22, 1964.

Yegge, Hall & Shulenburg, Robert B. Yegge, Denver, Colo., and Looney, Watts,

684

Looney & Nichols, Oklahoma City, Okl., for plaintiff.

Emory L. O'Connell, and Robert J. Enochs, Fred M. Winner, Denver, Colo., and Cecil R. Ditsch, Littleton, Colo., for defendants.

DOYLE, Judge.

This was a trial to the Court. The within opinion will serve to set forth the important facts and conclusions so that formal findings are deemed unnecessary.

The action as filed originally sought statutory treble damages for alleged usury growing out of a real estate development in which the plaintiff Dennis and his then associates sought and obtained financial assistance from the defendants Bradbury and Burt. At the trial the plaintiff dropped the treble damage claim and now limits his demand to one of *quantum meruit* for excessive interest paid.

The cause has been before this Court on numerous occasions but has not come to trial on its merits until a relatively recent date.

As a result of a jurisdictional ruling there was an interlocutory appeal. See Bradbury v. Dennis, (10 Cir.) 310 F.2d 73. It was there held that an assignment to plaintiff from an insolvent corporation was not "improper or collusive" within Title 28 U.S.C. § 1359.

More recently, this Court considered the question whether the transaction in question is to be regarded as a loan or as a vendor-vendee transaction, or a contract of joint venture. The predominant character of the agreement was held to be that of a loan or financing agreement.

At the pre-trial conference it was determined that defendants were entitled to introduce parol evidence in an effort on their part to show that in truth the transaction was one of joint venture or partnership involving profits rather than interest. Trial was thereupon had on September 30, 1964; briefs have been filed and the matter is now submitted on the merits.

The main question continues to be whether the sums paid to defendants are to be regarded on the one hand as interest, or on the other hand as profits of a joint venture. Now, however, we are not limited to the agreements, but can consider them in the light of the evidence.

Defendants have, however, raised other questions which require some comment. The important of these may be described as follows:

1. Whether there is under Colorado law a common law remedy or whether the treble damage remedy provided by statute excludes any other remedy.

2. Does the one-year statute of limitations applicable to usury treble damage actions bar this action.

3. Whether the plaintiff is a proper party to maintain the action.

A summary of the important provisions of the contracts must precede an analysis of the evidence in order that the evidence will assume perspective.

The basic contract, Exhibit 1, was entered into on March 2, 1957. The contracting parties were the defendants (first parties) and the plaintiff, together with his then associate, John R. Mallon.

It provided that Bradbury and Burt would immediately make available the sum of $78,000.00 together with a further sum of $22,000.00. These funds were to be used for the acquisition in fee by defendants of a certain described tract of real estate which was under the agreement to be conveyed to defendants by the "present owners" (Dennis and Mallon). The sums were also to be used to develop the tract.

Paragraph 2, the crucial paragraph of the agreement, goes on to provide that second parties, (plaintiff), shall be entitled to receive conveyances back of individual lots upon the payment by them of $2200.00 for each lot to be applied to the principal of the fund advanced, plus the payment of an additional $500.00 "bonus" or a total of $2700.00 per lot. Other provisions of this paragraph give plain-

tiffs the right to sell certain lots without paying the principal sum but requiring that they pay the $500.00 bonus in each instance. The text of this provision is set forth below:

"Second parties shall be entitled to receive conveyances of individual lots in said Southwood Addition subject to the same liens and encumbrances aforesaid, and also subject to all liens or encumbrances suffered to attach thereto by Second Parties upon payment to First Parties of the sum of $2,200.00 to be credited against the fund of One Hundred Thousand Dollars ($100,000.00) made available by First Parties, as aforesaid, and upon the payment of an additional $500.00 bonus, or a total of $2,700.00 per lot conveyed to Second Parties. Provided, however, that Lots 2, 3, and 4, in Block 2, and Lots 2, 3, 4, 5, 7, 8, and 9 in Block 5 of said addition shall be conveyed by First Parties to Second Parties upon payment of the sum of $500.00 only for each lot, said $500.00 for said lots to be bonus to First Parties. Second Parties agree to pay First Parties sufficient sums, as aforesaid, to cover the conveyance to Second Parties of not less than four (4) lots on or before April 1, 1957, and to pay sufficient sums for and to receive title to not less than Four (4) lots, as aforesaid, in each calendar month thereafter. Provided, however, that if at any time the aforesaid fund of One Hundred Thousand Dollars ($100,-000.00) made available by First Parties shall be completely restored to First Parties from the payments of $2,200.00 per lot, as aforesaid, or otherwise, then Second Parties shall be entitled to receive conveyances of further lots upon the payment of $500.00 per lot bonus only."

The agreement further provides that there shall be additional amounts advanced upon a revolving fund basis. It also sets up a method for disposition of the funds by appointment of the Colorado Title Service Company as an escrow agent.

An addendum added the same day sets up indebtedness limits declaring that the total amount outstanding after December 1, 1957, shall not exceed $90,000.00, and after January 1, 1958, shall not exceed $70,000.00; after March 1, 1958, shall not exceed $50,000.00. This addendum also provides for termination of the contract giving to the defendants an option to terminate under specified conditions and provided for continuation of the payments of bonuses for each lot sold. A further provision of the addendum is that the plaintiff Dennis and that his Associate, Mallon, personally guarantee all of the indebtedness.

A further and supplemental agreement was executed March 31, 1958. This recites that the second parties (plaintiff and Mallon) failed to make the payments demanded by the original agreements. It acknowledges the right of defendants to foreclose but declares that they desire to work out a settlement of the agreement without waiving any right to foreclose. This supplemental agreement proceeds to give to defendants the right to collect all proceeds from lots sold and to pay costs and expenses in connection with the development, finally assigning to the plaintiff Dennis and Mallon all moneys left over from the sale after the defendants have been reimbursed under the terms of the original agreement of the addendum.

In the Court's interlocutory decision of April 27, 1964, the above-described contracts were construed and it was concluded that the transaction as reflected by the agreements was a loan. There, it was said:

"Where, as here, money is made 'available' and sometimes described as 'advanced' in varying amounts and at different times, interest is charged; there is an overall plan of financing; various provisions protect and safeguard the amount of security; an individual and absolute obligation to repay, apart from the se-

curity, is imposed the conclusion is inescapable that the transaction is a financing arrangement, that is to say a loan."

It was further stated:

"In the present case there was no effort, studied or otherwise, to disguise the loan aspect of this transaction. It appears to be a loan and it is in substance a loan. It was, indeed, conceded by counsel for the defendants on oral argument that the transaction in question was at least in part a loan, plus to be sure something else. We find that the agreement of March 2, 1957 did embody a loan-mortgage agreement, and that it did not embody a bona fide sale coupled with an agreement to repurchase. We expressly make no finding with respect to the amounts which are deemed to be interest on that loan. Our finding that the agreement of March 2, 1957 embodied a loan-mortgage transaction does not preclude a subsequent finding that the parties were at least to a limited extent, joint adventurers.

"It is sufficient for present purposes to conclude that the predominant character of this transaction is a financing arrangement or loan and that is our conclusion."

At the trial evidence as to the intent of the parties was received, it having been held at the pre-trial conference that some of the terms were sufficiently ambiguous to justify reception of parol testimony.

From this testimony it would appear that plaintiff and his associates purchased the tract in question with a view to developing it. It consisted of approximately eighty acres located in Arapahoe County, Colorado. A plat had been filed and had been submitted to the Federal Housing Administration and the Veterans Administration prior to dealings with the defendants here. Dennis had been furnishing the money and in the first part of 1957 was having difficulty financing the venture. T. W. Anderson, a real estate broker and developer, had as agent of Robert and Ruth Lee, sold the tract to Dennis, et al. so the latter went to Anderson and asked him for financial help. Anderson stated that he was not in position to make a loan of this magnitude, that is, of $100,000.00 but he agreed to put Dennis and Mallon in touch with the defendants Bradbury and Burt. So, in February, 1957, a conference was held in the office of Anderson at which Bradbury, Burt, their lawyer, and Mallon were present. Bradbury and Burt agreed to make a loan of $100,000.00 at six per cent interest plus a $500.00 bonus on each lot. At that conference the framework of the controls together with method of payments was agreed upon. A Mr. Robert Haines of the Colorado Title Company was brought into the conference and was asked to draw a contract embodying the expressed purposes and terms. Haines did so and the parties met the next day at the office of the attorney for Bradbury and Burt and on this occasion the addendum referred to was added.

The testimony of Anderson was that the plaintiff and Mallon had indicated a willingness to pay as much as $800.00 per site as profit, or bonus, in order to get the money.

The testimony of Bradbury and Burt was that it was orally represented to them that the parties not only needed money but needed associates who had standing in the community and could lend their names to the enterprise. They further testified that they went into the transaction upon the basis that they were more than money lenders; that they were part of the development. Indeed, there was considerable evidence that various contractors who participated in the development were willing to lend credit and perform work only upon the basis of the presence of Bradbury and Burt as participants. One of the important contractors had known both of the defendants for many years and testified that after performing initial work he dealt with Bradbury and Burt regu-

larly, taking orders from them and relying on their ability to pay the bills.

■ It is to be mentioned here that the evidence does not disclose that Bradbury and Burt were moneylenders. Mr. Bradbury is a farmer and business man; Mr. Burt is primarily an automobile dealer who has engaged in other enterprises from time to time. There is no evidence which would indicate that there was any corrupt intent on their part to violate the law; in fact, there is no indication that they were specifically aware of the usury limitations in the Colorado statutes or that they considered such a possibility at the time of entering into the agreement. Such an ingredient is not, however, necessary. The Colorado statute does not require a specific intent to violate the law. Therefore, it would seem to be sufficient if the defendants intended to enter into a contract calling for interest in excess of the limitation permitted by law. See the note in 91 C.J.S. Usury § 14 c, p. 585; see also footnotes 57 and 60.

From the testimony it would appear that the enterprise proceeded relatively well for a time but that the plaintiff Dennis encountered financial difficulties in 1958. The project again bogged down. This necessitated the execution of the supplemental agreement which has been described above and upon the basis of this Bradbury and Burt took over active control of the development. A real estate broker took over the sale of the individual lots and Bradbury and Burt were most active in bringing the transaction to a relatively successful completion. Lots were being sold even after this suit was commenced.

The evidence also justified the finding that the enterprise could not have succeeded had it not been for the money and the efforts of Bradbury and Burt. One gets the impression that the plaintiff Dennis had a limited interest, financial and otherwise, in the realities of the development. To be sure, he conceived the original idea and was able to foresee the potential of it. It remained, however, for Bradbury and Burt to see the project through to completion—to sell the lots and retire the indebtedness which included several advances. They realized $500.00 per lot on the numerous lots sold, but did not take the six per cent interest which the original contract provided. The total amount of bonus actually paid to or received by the defendants was $93,-500.00. Plaintiff concedes that the sum of $18,042.11 could have been lawfully paid to the defendants. Thus, the sum in issue would appear to be $75,457.89.

I.

The primary question is whether, in the light of the facts as outlined, the several contracts are to be construed as agreements of joint venture or partnership rather than of loan.

■ Although the equities in the case favor the defendants, the Court finds it impossible, even giving full effect to all the testimony, to conclude that the contracts in question constituted anything more than a financing arrangement under the terms of which the plaintiff and his associates agreed to pay a bonus for the use of money advanced from time to time by the defendants. The contracts *themselves* are, of course, almost conclusive evidence that the arrangement was one of loan rather than something else.

*First* of all, as originally drafted, it was a question of advancing money for the purpose of completing the real estate development. Bradbury and Burt took no risk whatever. They were guaranteed a payment regardless of success or failure.

*Secondly,* tight controls were provided. All of the land was conveyed to Bradbury and Burt on the basis that individual lots would be released as they were sold provided the bonus was invariably paid and provided that $2200.00 per lot would be in all except a few instances devoted to reduction of the outstanding indebtedness. Indeed, Bradbury and Burt were unwilling to entrust their money to Dennis and associates. They made provision for disposition of funds through an escrow agent upon their order.

*Thirdly,* Dennis and Mallon personally guaranteed the payment of the indebtedness quite apart from the security provided by the conveyance of the entire tract to Bradbury and Burt.

*Fourth,* the supplemental agreement of 1958 did not change the basic character of the agreement. Although it talks about foreclosure, it merely places Bradbury and Burt in a position of control. This is the very type of thing that a bank or moneylending institution would insist upon if its loan were to become imperiled and thus this does not point up something in the nature of a joint venture.

It is not difficult to understand why Bradbury and Burt regard the transaction as something other than a loan inasmuch as they were required to not only make their money available, but to spend time and much effort in bringing the project to a successful conclusion. However, this does not change the basic character of the transaction as predominantly a financing arrangement. What occurred at the time of execution of the contracts is of more importance in ascertaining meaning than are subsequent developments. It is possible that the supplemental agreement could have brought about basic modifications and changes in the original contracts but it did not do so. It embraced all of the terms of the original contracts, referred back to them, and undertook to carry the several provisions to complete execution.

In the light of those conclusions it can not be determined that the parties intended that the transaction would be one of joint venture or partnership. The important reason is that it lacked an essential element of a partnership, namely, the sharing of losses and gains. Bradbury and Burt had a specific guarantee —their profits came off of the top, so to speak. Dennis and Mallon were personal guarantors of principal and profits. Thus, it is apparent that this was nothing more nor less than a lending arrangement on a guaranteed flat fee basis whereby the conveyance of property to the lenders provided necessary security for the loan.

The Court's memorandum of April 27 cited Restatement of Contracts, section 529, together with 6A Corbin on Contracts 685–7, section 1501. These authors point out that a contract is to be regarded as usurious in circumstances like the present even though it is not a straightforward loan transaction. It is the duty of the Court to ascertain the true character of the arrangement. See also Young v. Barker, 185 Kan. 246, 342 P.2d 150 and Stock v. Meek, 35 Cal.2d 809, 221 P.2d 15 (1950, Opinion by Traynor, J.). For cases involving use of the term "bonus" see Bowen v. Mount Vernon Savings Bank, 70 App.D.C. 273, 105 F.2d 796 and Mee v. Lewis, 177 Okl. 364, 58 P.2d 883. It would appear, furthermore, that even though an agreement has some aspects of a partnership or joint venture, it runs the risk of being held to come within the usury statute if one partner binds himself to absolutely repay advances to another partner. See 91 C.J.S. Usury § 26, wherein the author states:

"Since advances made to a partnership or joint adventure by one of its members are subject to the hazards of the business or undertaking, any rate of interest that may be agreed on for such advances is legal; but if the other partners or joint adventurers bind themselves absolutely to repay such advances, thus exempting the lending partner from risk of loss, only legal rates may be charged. So the mere form of a partnership agreement whereby the person supplying the money has its repayment secured with a certain profit of more than the legal interest will not preserve such a contract from the consequences of usury, and the mere fact that a loan has grown out of the dealings of a partnership does not prevent a loan at excessive rate between the former partners from being usurious."

In the case at bar there was no serious attempt to disguise the contract. The character of the contract as one of loan

was not hidden. The only misleading feature was the unenforced provision for interest at six per cent.

It must be concluded that in form as well as in substance the transaction is one of loan. The so-called "bonus" is nothing more than payment for use of the money advanced.

## II.

Plaintiff has, as previously noted, dropped his claim for statutory treble damages and now limits his demand to single damages pursuant to a common law remedy. Defendants challenge his right to thus change horses midway in the stream. Why they take issue here is not entirely understandable since even giving effect to the short limitations provision the treble recovery far exceeds a common law judgment. Nevertheless, the important remaining issue is thus whether a remedy of money had and received to recover payments of usurious interest exists in Colorado.

The almost universal rule is that such a remedy existed at common law and that it may be abrogated or superseded by statute. An annotation in 59 A.L.R.2d 522, *Right in absence of statute expressly so providing, to recover back usurious payments* (1958), reflects that about thirty-one jurisdictions have expressly recognized this common law remedy; in a few of these jurisdictions, subsequent statutes have abrogated or have superseded this remedy. Eight jurisdictions impliedly recognize the common law remedy by holding that a relevant statute has abrogated or superseded it. Apparently, the only jurisdiction which unequivocally denies the existence of the common law right is Nevada. This distinctive decision, Hawthorne v. Walton, 72 Nev. 62, 294 P.2d 364, 59 A.L.R.2d 519 (1956) is the case which is reported preceding the above-mentioned annotation (59 A.L.R.2d 519).

The history and background of the common law right is set forth in Horack, A Survey of the General Usury Laws, 8 Law and Contemporary Problems 37, at 37 and 38 (1941). This author tells us that the charging of any interest for a loan of money was at early common law condemned and prohibited. It was the pressures of expanding business which led to the enactment in 1714 of the Statute of Usury, " * * * which was to become the prototype of all such legislation in the United States." This statute fixed the maximum rate of interest at five per cent. Thus the so-called "usury" statutes were really intended to legalize the exaction of interest. Only incidentally did they provide a limitation of interest charges and a standard for determining what constitutes usury. In Bosanquet v. Dashwood, Cas t Talb 38, 25 Eng.Reprint 648 (1734), the usury statute of 1714 was treated as the standard. After the repeal of this statute, the criterion resorted to by the English courts was whether the transaction was harsh or unconscionable. Part v. Bond, 94 LT 490, 22 Times L 253 (1906).

The more narrow question, then, is whether the Colorado usury statute, CRS 1963, 73–2–1 et seq., CRS 1953, 73–3–1 et seq., is in form or substance such that it can be regarded as superseding the right which existed at common law. There is, of course, no interpretation problem where the statute explicitly abrogates or supersedes the common law right, but the Colorado statute does not do so, hence we must examine the background literature on the subject in search of interpretation guides which will provide an answer. Representing one view is the statement which is found in an early Wisconsin decision, Wood v. Lake, 13 Wis. 84 (1860):

> "A remarkable unanimity of opinion upon this question seems to have prevailed among the courts of Great Britain and those of the several States of the Union where laws against usury, properly so called, have existed. It has been universally held, where statutes forbid the taking of excessive interest, and punish a violation of their provisions by the infliction of fines, penalties, or forfeitures upon the person who takes it, that the person who pays

the same may, independently of the remedies afforded by the statutes, maintain an action for money had and received, at the common law, to recover back the money so paid. In such cases, both parties are not understood to be in *pari delicto*, so as to preclude a recovery by either."

The Wisconsin Supreme Court in effect said that where the statute sufficiently condemns usury, it expresses a legislative policy approving the common law remedy and hence its retention in addition to any statutory remedy. The aptness of this reasoning apparently stems from the fact that usury statutes, as already observed, depart from the common law in legalizing interest for loans of money; hence strong condemnation of excessive interest is in effect approval to that extent of the substantive common law viewpoint.

Several jurisdictions have adopted a test differing from that set forth in Wood v. Lake. These courts hold that it is insufficient for the statute to condemn usury; that the test of continued existence of the common law remedy is whether the legislature has declared the usurious contract to be void. Thus under this test the public policy expression must be stronger.

■ Regardless of whether the "declaration of voidness" test or the "condemnation of usury" test is applied, at bar it would appear that the common law remedy has not been abolished in Colorado.

The common law rule prohibiting charging of interest for loans of money was abolished in Colorado in 1865 and from that date until 1913 the parties were free to charge interest and to fix the rate. While on its face this statute abolished any right of action based on usury, the decisions evidence a reluctance on the part of the Colorado court to give full effect to it. Browne v. Steck, 2 Colo. 70 (1873); Morgan v. Dod, 3 Colo. 551 (1877); Hochmark v. Richler, 16 Colo. 263, 26 P. 818 (1891). In the Browne

case, a provision for interest at the rate of ten per cent per month after maturity of a note was upheld. However, the opinion contains the following observation:

"The law seeks to indemnify the plaintiff for the loss he has suffered by the breach of the contract, and it is fair to presume that the rate fixed by the parties affords a just rule of indemnity. If, however, the rate of interest specified in the contract greatly exceeds the real value of the money, it is to be regarded as a penalty for the non-payment of the principal sum, rather than a just recompense for detaining it."

The Court thus suggested that the ten per cent per month provision might have been considered as a penalty if it had also appeared that the going rate of interest at the time the note was executed was substantially less than ten per cent.

The Hochmark case held that, while a provision for compound interest does not render the whole contract void and usurious, the contract is to that extent illegal and unenforceable.

The usury statute now before us was enacted in 1913. The original measure, in effect from 1913 to 1935, applied to loans in any amount. It applied to loans in excess of $300.00 from 1935 to 1955, and to loans in excess of $1500.00 after 1955. Sullivan v. Siegal, 125 Colo. 544, 245 P.2d 860 (1952); Klipping v. McCauley, 143 Colo. 444, 354 P.2d 167 (1960).

Under the Wood v. Lake, supra, test, the Colorado statute clearly condemns usury in that it prohibits excessive interest, and provides for the punishment of violators. Section 1 requires a lender to obtain a license if he wishes to charge twelve per cent per annum on secured loans. CRS '53, § 73–3–1. Section 5 fixes the maximum rate of interest which any lender may charge at two per cent per month. CRS '53, § 73–3–5. Section 7 provides a treble damage remedy for a borrower who has paid more than the statute permits the lender to receive. CRS '53, § 73–3–7. Section 9 makes any

violation a misdemeanor punishable by a fine of $25.00 to $300.00, or by imprisonment of five to thirty days, or by both. CRS '53, § 73–3–9.

Defendants, relying on Waddell v. Traylor, 99 Colo. 576, 64 P.2d 1273 (1937), to the effect that a usurious contract is not void in its entirety, seem to take the position that the "voidness" test applies in Colorado. We must conclude, however, that this case does not help defendants for the reason that it does recognize that a contract exacting usurious interest is void to the extent of the usurious interest. Waddell was a suit by the lender to recover the balance owed on the note plus interest as agreed upon. The court, in considering whether the lender could recover anything, held that he was entitled to the principal plus the amount of interest allowed by the statute. To that extent the contract was not void. But as to the usurious interest, the court said:

> "The provisions in the act, that treble the interest paid, if in excess of the rates specified, may be recovered, and that a violation of the act shall be a misdemeanor, amounts, we think, to a declaration of public policy that a contract for payment of interest in excess of the specified rate shall not be enforceable as to such excess, and this, notwithstanding section 3779, C.L.1921 (Sess. Laws 1889, p. 206, § 3), providing that, 'The parties to any bond, bill, promissory note, or other instrument of writing, may stipulate therein for the payment of a greater or higher rate of interest than eight per cent per annum, and any such stipulation may be enforced in any court of competent jurisdiction in the state.' That the Legislature in 1889 did not see fit to place restrictions on the rate of interest to be charged, did not preclude it, in 1913, from making certain interest charges *void* or even criminal. In so far as the two acts are inconsistent, the later act must prevail." [Emphasis supplied]

Two more recent cases reinforce the conclusion that a usurious contract is void to the extent that it exacts usurious interest. In Waggener v. Holt Chew Motor Co., 130 Colo. 294, 274 P.2d 968 (1954), the Colorado Supreme Court characterized a usurious contract as one inherently illegal (as to excess interest). The lender there obtained a license prior to receiving payments of either principal or interest. The borrower sued for treble the usurious interest. In allowing him to recover the Court held that:

> "Valid contracts may not arise out of transactions forbidden by law. The illegality inhering at the inception of such contracts taints them throughout and effectually bars enforcement.

> "We must conclude that since the contract which defendant made without first procuring a license was enforceable only as to the principal and interest at twelve per cent per annum. The lender could not lawfully collect more than twelve per cent per annum interest, whether subsequently licensed or not."

The voidness of a contract to the extent of usurious interest is also recognized in the more recent decision of Klipping v. McCauley, 143 Colo. 444, 354 P.2d 167 (1960). That case involved a loan of $655.00 extended in 1950 in return for two notes. Because of the amount of the loan, the transaction came within the provisions of the Act of 1913, the act presently before us, and not within the provisions of the Small Loans Act of 1935. However, this last named act was modified in 1955 to cover loans of up to $1500.00. In 1956, the borrower redeemed the notes for $1328.00. Subsequently, he sued to recover usurious interest payments. The court held that, since the transaction was illegal when entered into, it was not constitutionally protected from being embraced within the later 1955 Act. That act provided, as does its present counterpart, that a usurious contract is void, "and the lender shall have no right to collect, receive, or retain any principal interest or charges

whatsoever." The court awarded the borrower only the interest, presumably because he did not demand the principal as well. According to this case then, a usurious contract is void *at least* to the extent of usurious interest.

While there appears to be no Colorado case expressly so holding, all evidences point to the conclusion that under Colorado law a usurious contract is void to the extent of the usurious interest. Moreover, the legislature's condemnation of usury is manifest. The Colorado public policy pronouncements against retention of usurious interest have been strong. Consequently, we feel constrained to hold that in Colorado, as in most jurisdictions, the common law remedy exists side by side with the statutory treble interest remedy. And as in most jurisdictions, the common law remedy appears to be a claim for money had and received. See, for example, Bridges v. Ingram, 122 Colo. 501, 223 P.2d 1051 (1950), holding that recovery for breach of contract can be had by way of an action for money had and received.

▮ The applicable statute of limitations then is six years. CRS '53, § 87–1–11(4); Goff v. Plains Securities Corp., 116 Colo. 468, 183 P.2d 262 (1947). For cases in other jurisdictions, see Babcock v. Olhasso, 109 Cal.App. 534, 293 P. 141 (1930), where, in addition to treble the usurious interest paid within one year prior to his bringing suit, the borrower was allowed to recover usurious interest paid prior to that year; Neuscheler v. See, 131 N.J.L. 368, 36 A.2d 753 (1944); and Stock v. Meek, 35 Cal.2d 809, 221 P.2d 15 (1950).

### III.

Defendants raise a question as to the right of the plaintiff to maintain this action at all in view of the fact that the D. M. & E. Construction, Inc., successor to D. M. & E. Construction Company, a partnership, carried on the development. It would appear that much of the problem has been solved by our ruling that the plaintiff has a common law rem-

edy, it having been contended that the action was for a penalty which could not be assigned. It is noteworthy that the plaintiff has exhibited assignments from all parties who could have asserted a right including the D. M. & E. Construction Company. It is also noted that the contracts were in the names of Mallon and Dennis individually. Mallon has executed an assignment as of December 4, 1958; the assignment of D. M. & E. Construction Company is dated February 28, 1959.

▮ The right of action herein would appear to be assignable and, therefore, the right of the plaintiff Dennis to maintain the suit cannot be questioned.

The defendants have in effect argued that the various legal postures assumed and the various assignments have in some way caused the right of action herein to evaporate, or dissipate. The charges complained of were made, and the plaintiff appears to be in an unquestionable legal position to assert the right and to maintain the action.

### IV.

▮ The remaining issue is that of the proper amount of the judgment. At the trial the plaintiff presented expert testimony to show that the total amount obtained by defendants in bonuses was $93,500.00. This testimony also tended to establish that the net amount to which the plaintiff would be entitled after deduction of twelve per cent interest applied to the various balances would be $82,715.44. However, in his trial brief plaintiff has set the amount of interest at $18,042.11, leaving a balance of $75,457.89. In view of this conflict the Court is disposed to treat the statement contained in the trial brief as a judicial admission and to adopt this as the proper figure.

It is, therefore, concluded that plaintiff have judgment against the defendants and each of them in the amount of $75,457.89. It is

Further directed that the entry of judgment be withheld until counsel for

plaintiff prepares and submits a formal judgment for the Court's signature. Time for filing motions for new trial or notices of appeal shall not commence to run until judgment is formally entered.